# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 16-cv-62134-BLOOM

MARIA ALEJANDRA REYES OVALLE,

      Petitioner,

v.

NOE MANUEL PEREZ,

      Respondent,

_____/

## ORDER ON VERIFIED PETITION FOR RETURN

**THIS CAUSE** is before the Court upon Petitioner Maria Alejandra Reyes Ovalle's ("Petitioner" or "Mother") Verified Petition for Return of Child to Guatemala, ECF No. [1] ("Petition"), filed on September 7, 2016.  Petitioner seeks the return of her infant son, E.L., pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"), T.I.A.S. No. 11, 670, 1343 U.N.T.S. 89 (Oct. 25, 1980).  Both the United States and Guatemala are signatories.  The Convention is implemented in the United States through the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq*.  Petitioner contends that Respondent Noe Manuel Perez ("Respondent" or "Father") wrongfully removed their son from Guatemala to the United States in July 2016.

After the Court ordered expedited proceedings, ECF No. [4], Respondent filed a response to the Petition, ECF No. [9] ("Response" or "Resp."), in which he contends that return of E.L. would be inappropriate as Guatemala was not the place of E.L.'s habitual residence at the time of his removal.  Resp. at 1-2.  Respondent further argues that Petitioner is not entitled to the protections of the Convention because she first wrongfully abducted E.L. from the United States,

where he was in fact habitually residing.  *Id*. at 2.  The Court conducted a four-day evidentiary hearing on the Petition on September 21, 23, 26 and 27.[1]  ECF Nos. [22], [25], [27], [28].  At the hearing, Petitioner testified and called one other witness during her case-in-chief, her mother Liliana Ovalle Solis de Reyes.  Respondent also testified and called three witnesses during the presentation of his case: Saby Quevedo Solis, Respondent's friend, business associate and Petitioner's mother's half-sister; Jose Ruiz, Respondent's friend; and Astrid Jenifer Lemus, Respondent's niece.

At the outset, the Court notes that Convention proceedings are by their nature difficult and emotionally charged because they involve conflict over a child.  This case, however, is particularly poignant because it involves a child who is not yet one year old, and parents who both fiercely love their son, but who both manipulated legal proceedings to wrest control of their son from one another.  After careful consideration of the Petition and Response, the testimony, exhibits, briefing, applicable law, and arguments of counsel, the Court **GRANTS** the Petition, ECF No. [1], and orders that E.L. be immediately returned to Guatemala with his mother, Petitioner Maria Alejandra Reyes Ovalle.

## I.     BACKGROUND

Petitioner is a single Guatemalan woman and a successful entrepreneur who owns and runs an auto mechanic shop in Mixco, Guatemala.  In addition to her business, Petitioner also owns a home, which she has spent the last two years building as an investment property. Petitioner was born in Guatemala and was raised in a family with traditional values, regularly attending church. She and her brother continue to live with both parents in their parents' home.

---

[1] Petitioner and Respondent also submitted Proposed Findings of Fact and Conclusions of Law. *See* ECF Nos. [33], [34].

Respondent is a divorced United States citizen originally from Guatemala, and shares many of Petitioner's family values.  Respondent is also a successful entrepreneur, who owns several businesses in the United States and a mechanic shop in Guatemala, which is managed by Saby Quevedo, Petitioner's mother's half-sister.  Respondent has two children from his first marriage, ages eleven and thirteen, of whom he shares custody with his ex-wife.  His children alternate days, weekends, and holidays between living with Respondent and his ex-wife.  He is a resident of Hollywood, Florida and has been in the United States since 1986.

### July 2014 - May 2015: The Courtship

Petitioner and Respondent met in mid-2014 in Guatemala. This was during the time when Respondent stayed at Petitioner's parents' house during a visit from the United States. Respondent was a guest of Ms. Quevedo, who at the time was living at her half-sister's house. Petitioner and Respondent took a liking to one another, and Respondent began to visit Guatemala on a monthly basis, in part to spend time with Petitioner.  They began their official courtship in July 2014, and continued to date long distance.  Petitioner and Respondent communicated via cell phone, video chat, and text messages, and saw each other when Petitioner traveled to Guatemala.  When Respondent visited Guatemala, he stayed as a guest at Petitioner's parents' house, in his own room on a different floor from Petitioner.

Shortly after they began dating, they traveled to Honduras to a wedding of the Respondent's friend.  Because this was the couple's first trip alone together, Respondent felt that it was important to respect Petitioner's family values and asked her parents' permission to take her on the trip—which he did.  Respondent also testified that the Honduras trip was a turning point in their relationship as they became very close and began to discuss their desires for the future, including Petitioner's desire to become a mother.

At the end of 2014, Petitioner and Respondent decided to spend the holidays together. Respondent again asked Petitioner's parents for permission to allow Petitioner to travel to Hollywood, Florida to spend Christmas with Respondent and his children. Respondent knew that Christmas was an important time of the year in their culture, and it would be the first time Petitioner spent the holidays away from her family. Her parents agreed, and the couple spent Christmas together in the United States. Petitioner obtained a tourist visa in November 2014, valid for ten years, which allowed her to remain in the United States for up to six months at a time. Respondent traveled back to Guatemala with Petitioner to spend the New Year with Petitioner's family.

In February, 2015, Petitioner traveled to Florida again to spend Valentine's Day with Respondent. In March, 2015, Respondent traveled to Guatemala for eight days to accompany Petitioner to her friend's wedding. Petitioner became pregnant during this trip. In April 2015, Petitioner learned that she was pregnant and informed Respondent, who was back in Florida, via telephone. Later that month, Respondent traveled to Guatemala and he and Petitioner delivered the news to her parents. While her parents were happy that they would be grandparents, they were unhappy that their daughter had become pregnant out of wedlock because it did not comport with their values. Petitioner's parents demanded to know when the couple would marry; and although they had spoken about marriage during the course of their relationship, Respondent became upset during this conversation and told Petitioner's parents that the decision to marry would be his and Petitioner's alone at a time that was right for them.

### June - July 2015: The Pregnancy and Visit to the United States

The parties differ as to Respondent's level of enthusiasm regarding the news of Petitioner's pregnancy; nevertheless, Petitioner spent the majority of her pregnancy in

Guatemala, where she regularly saw her obstetrician.  However, in June, Petitioner traveled to the United States to visit with Respondent.  The parties' testimony again diverges regarding the purpose of the trip.  According to Petitioner, from the moment she became pregnant, she wanted her son to have a family, and she felt it was important to see what type of life Respondent led in the United States with his children, so that they perhaps could form a family.  Before leaving Guatemala, Petitioner made arrangements for her mother to be able to manage the daily business at Petitioner's shop while she was away. This included leaving signed checks for her mother's use and leaving her many pets for her family to care for. According to Respondent, Petitioner was moving to Florida; however, Petitioner took only one suitcase with her.

Likewise, the parties disagree regarding the quality of the trip.  Petitioner testified that Respondent paid very little attention to her, and she spent most of her time at his home cleaning, cooking, and doing the laundry while he was at work.  Even though she spent time with Respondent's children, she did not have a good relationship with Respondent's son, and felt that he did not treat his younger sister very well.  Overall, Petitioner found the trip to be unpleasant and Respondent's attention toward her and their unborn child was lacking.  Respondent testified that he was aware that the visit was unpleasant for Petitioner, but he attributed it to the fact that she was experiencing pregnancy-related nausea and dizziness, and she was not letting him help her in the manner in which he wanted.  Ultimately, Petitioner returned to Guatemala on July 9, 2015.

### July - October 2015: Petitioner in Guatemala

Once back in Guatemala, Petitioner decided that she would not return to the United States and told Respondent that she did not intend to do so.  However, according to Respondent, they began communicating more often, and their text messages were again affectionate.  In August,

Respondent traveled to Guatemala and saw Petitioner.  At the time, Respondent asked Petitioner to come back to Florida, and presented Petitioner with an engagement ring.  The parties again disagree regarding what happened next.  According to Petitioner, she rejected the ring based upon everything she had experienced during her previous trip to Florida.  Respondent apparently asked Petitioner for the opportunity to show her that things could change and they could have a relationship for their child.  According to Respondent, he bought the ring before the trip as a surprise, and when he proposed, Petitioner said yes emotionally and enthusiastically.  Her parents were happy to hear the news of the engagement, though Respondent did not give Petitioner the ring in front of her parents, nor was there an engagement party or wedding date scheduled.  Respondent testified that at the same time, they began to plan a date for her to move, and told her parents that she would be moving to the United States.  Respondent went back to the United States after this visit.

Thereafter, as Petitioner made plans to have her first ultrasound, she invited Respondent to be present and he returned to Guatemala at the end of August. During that time, the parties both discussed their relationship again.  Respondent wanted Petitioner to return to Florida to continue the relationship.  They talked about trying to form a family, resolve their differences and have their child born in a home with two parents.  At the time, there were no discussions between them of a fiancé visa. The Respondent admitted that he consulted an immigration attorney upon his return to the United States who advised him not to marry Petitioner right away because she was pregnant, and it could raise a red flag.  Petitioner was aware and vigilant of her immigration status, and testified that she did not consider remaining in the United States illegally.

In mid-September, Petitioner was seven months pregnant. Following discussions with Respondent regarding their relationship, Petitioner decided to return to Florida to attempt to make the relationship work. Petitioner was aware that Respondent had no intention of leaving his home and two children and the late stage of her pregnancy would not allow her to travel again until after the birth of her son. As a result, Petitioner agreed to give birth in Florida. Before she departed Guatemala, Petitioner had a baby shower at her parents' home on September 26, 2015, which Respondent did not attend. Respondent traveled to Guatemala on September 30, 2015 and travelled back to the United States with Petitioner on October 4, 2015. Petitioner testified that during this short visit to Guatemala, Respondent gave her the same ring with which he had attempted to propose in August, but that they did not discuss a specific date to marry, other than Respondent's desire that they marry before the baby was born. Petitioner testified that she accepted the ring because she wanted to make an effort to make the relationship work. However, Petitioner never wore the ring.

### October 2015 - February 2016: Parties in the United States for E.L.'s Birth

Petitioner was permitted into the United States on her tourist visa, and she and Respondent remained in Florida until the end of February, 2016. Petitioner did not close any of her bank accounts in Guatemala, construction continued on her investment property, and she continued to earn income from her business there, with her mother's assistance in running the daily operations. Petitioner did not have an obstetrician or gynecologist in Florida, and did not visit a doctor in the last two months of her pregnancy. She and Respondent located a birth center, where Petitioner would be able to have a natural delivery according to her wishes, and in close proximity to a hospital. Petitioner and Respondent prepared a room together at Respondent's house for the arrival of the baby. Shortly before the baby was born, Petitioner's

mother traveled to the United States to provide assistance after the birth. The parties' son, E.L., was born on December 17, 2015. Although the birth was uneventful, the child did become jaundice which required medical treatment. At the mid-wife's suggestion, E.L. was able to travel after two months and efforts were made to obtain E.L.'s United States passport.

The parties' disagree once more on the general atmosphere and quality of the time they spent together between October, 2015 and the end of February, 2016. Petitioner testified that she did not feel welcome at Respondent's home and that she was surprised that no apparent preparations had been made for her arrival, or the arrival of the baby. The parties' relationship deteriorated further immediately before E.L.'s birth, in part as a result of a disagreement between Petitioner's mother and Respondent regarding E.L.'s name. Overall, it was not a happy time for Petitioner. Respondent, in contrast, testified that the time after Petitioner's arrival and until her mother's arrival was a very happy time. The problems began after his disagreement with Petitioner's mother regarding the baby's name. According to Respondent, in addition to expressing her dissatisfaction with their choice of name, Petitioner's mother also criticized Respondent's children. The parties agree, however, that Respondent and Petitioner's mother did not speak to each other again after that incident. Moreover, Respondent recognized that the disagreement hurt his relationship with Petitioner.

After Petitioner's mother returned to Guatemala in January, 2016, Petitioner expressed her dissatisfaction with their relationship to Respondent and her desire that her family in Guatemala meet E.L. In addition, Petitioner's visa stay was to expire in April, 2016. After much discussion, Respondent and Petitioner eventually planned a return to Guatemala for February 26, 2016, after obtaining E.L.'s passport. According to Petitioner, Respondent reluctantly agreed to travel after she told him that she did not want to put her visa in jeopardy by staying in the United

States too long.  Respondent testified that Petitioner's visa status was really not on his mind and that he would have preferred to wait the eight months to a year the immigration attorney advised him would be necessary to obtain a legal permanent resident card for Petitioner after they married.  Nevertheless, the parties traveled to Guatemala with E.L. on February 26, 2016.

### February 2016 - March 2016: Security Measures and Petitioner Stays

Due to the conflict between Respondent and Petitioner's mother, Respondent decided not to stay at Petitioner's parents' house in Guatemala.  Therefore, upon arrival at the airport in Guatemala, Petitioner was met by her father, mother, brother and cousin.  Respondent was met by Ms. Quevedo.  Because E.L. was breastfeeding, he remained with Petitioner.  Respondent had the passports in his possession when they exited the luggage area at the airport, and when Petitioner asked for the baby's passport, Respondent asked her why she wanted it.  After a brief exchange, Petitioner obtained E.L.'s passport from Respondent.  According to Petitioner, Ms. Quevedo warned Petitioner's mother at the airport not to allow Petitioner to become separated from the child's documents. Furthermore, Ms. Quevedo stated that she knew Petitioner was not happy in the United States and that she knew Respondent could take E.L. away from Petitioner.  Petitioner understood this to be a threat.  Ms. Quevedo denied that she made those statements or that the exchange took place. The Court does not find Ms. Quevedo's testimony to be credible.

Based upon Ms. Quevedo's statements to her mother, Petitioner consulted an attorney the next business day in Guatemala, inquiring whether her son could in fact be taken away from her in the United States.  The attorney advised Petitioner that, based on her having already spent almost five months in the United States on a tourist visa—during which time she had given birth to a child, and thereafter returning to Guatemala for one week only—she ran the risk of not being allowed to enter the United States.  The attorney further advised Petitioner that, even if she were

denied entry, Respondent would be able to enter the United States with the baby as they were both United States citizens.   As a result, on March 1, 2016, Petitioner obtained "Security Measures," the Guatemalan equivalent of a restraining order, to prevent Respondent from removing E.L. from Guatemala.  In the application for Security Measures, Petitioner stated,

> I am a victim of abuse, psychological, economic, moral and mental violence, threats, indignities and the most important he is threatening me that he will take my son away because he has American nationality, besides Guatemalan.  I have justified fear that he can kidnap my son and take him out of the country.  The attacks have happened in the United States and in Guatemala and I request Mr. Judge to ensure my and my son's physical integrity and that he is order[ed] to refrain from approaching us, and to place my son under restriction order to avoid his father from kidnapping him and taking him out of the country.

Petitioner did not inform Respondent of the Security Measures, even though she told him on March 3, 2016, that she would not be returning to the United States because she was afraid of losing her son.[2]  Respondent dismissed Petitioner's fears.  Despite Respondent's exhortations that Petitioner and E.L. return to the United States with him the following day, Petitioner stayed in Guatemala with E.L. and Respondent returned to the United States on March 4, 2016.

### March 2016 - July 2016: Pick-up Order and Respondent's Return to Guatemala

On March 6, 2016, before he learned of the existence of the Security Measures, Respondent initiated custody proceedings in Florida, in Broward County Circuit Court, and obtained an Order to Pick-Up Minor Child (the "Pick-Up Order").  In his Emergency Verified Motion for Child Pick-Up Order, Respondent stated that, "Father, Mother and the minor child resided in Broward County, Florida since the child's birth. . . .   The child has substantial connections to Florida as the child has resided in Florida since birth December 17, 2015.  Mother

---

[2] Respondent did not learn of the Security Measures until it was served on his business in Guatemala on March 8, 2016, when he had already returned to the United States.

and Father are residents of the State of Flor[i]da."  Once issued, the Pick-Up Order specified that because it was issued without notice to Petitioner, there would be a hearing held on April 1, 2016 to consider whether further orders were warranted.  Respondent, however, did not tell Petitioner that he had initiated proceedings in Broward County, or that he had obtained the Pick-up Order. In addition, Respondent filed a response in opposition to the Security Measures on March 11, 2016. In spite of these legal filings, the parties continued to communicate via text messages, in which Respondent expressed being hurt by Petitioner's obtaining Security Measures and how much he missed them both.  In those same text messages, Petitioner explained that she did not intend to prevent Respondent from having a relationship with his son, but that she had obtained the Security Measures to prevent E.L.'s removal from Guatemala without her consent.  At this point, the Court is confident in finding that the romantic relationship between Petitioner and Respondent had ended.

Between March and July, 2016, E.L. lived with the Petitioner and her parents. Respondent periodically sent money to Guatemala for the baby upon Petitioner's request. Both parties testified that the Petitioner and Respondent continued to communicate, with Petitioner sending photographs via text messages of E.L. In addition, Respondent traveled three times to Guatemala, from April 1-3, May 6-8, and May 29-June 1.  During these visits, Respondent visited Petitioner and E.L. at Petitioner's parents' house.  Respondent did not inform Petitioner about the Pick-Up Order or the scheduled hearing in Florida.  Nor did the Respondent seek relief from the Guatemalan Court despite the filing of his response to the Security Measures. According to Respondent, during this time, he was in communication with an official at the U.S. State Department and an attorney in Guatemala in attempts to have the Pick-Up Order enforced in Guatemala.  He also visited the United States Embassy in Guatemala to apply for an additional

passport for E.L. (because Petitioner had his original passport in her possession), so that they could travel by airplane back to the United States once the Pick-Up Order had been executed.  At the same time, Petitioner was attempting to obtain dual Guatemalan citizenship for E.L., but Respondent refused to sign the necessary paperwork.  According to Respondent, his attorney advised him that once E.L. obtained Guatemalan citizenship, Petitioner would be able to initiate custody proceedings in Guatemala.

### July 2016: Baptism and Abduction of E.L.

Petitioner planned to hold a baptism in Guatemala for E.L. on July 17, 2016, and invited Respondent to attend.  Respondent readily agreed. Because the process of enforcing the Florida Pick-Up Order in Guatemala was taking too long, Respondent formulated a scheme to take E.L. with his brother's help during the party after the baptism.  Respondent arrived in Guatemala on July 15, 2016.  The following day, Respondent asked Petitioner to accompany him to drop off an invitation to the baptism at a friend's house.  Petitioner, Respondent, and E.L. travelled together in her car to deliver the invitation. At the time, E.L. was asleep in Respondent's arms. Rather than wake him, Respondent asked Petitioner to take the invitation to the front door.  When she did, he got out of the car, placed E.L. in his car seat, and drove off, leaving Petitioner behind.

When Petitioner realized that Respondent had driven off in her car with their child, she immediately went to the police station and filed a complaint.  While she was doing so, she received several text messages from Respondent informing her where he had left her car, and that he had an order from an American judge permitting him to take E.L. At no time did the Respondent advise the Petitioner where he and E.L. were. Petitioner thereafter retrieved her car, and requested that the equivalent of an AMBER alert be issued.

After driving away, Respondent called his brother and planned a location to meet. After abandoning Petitioner's car, his brother drove Respondent and E.L. to a hotel near the United States Embassy, where Respondent apparently had an appointment the next morning to obtain E.L.'s additional passport.  That night, Respondent's brother informed Respondent that the police were looking for him, so Respondent and E.L. left the hotel room and went to his brother's friend's home instead.  Thereafter, Respondent determined that he ran the risk of being arrested if he went to the Embassy, so he abandoned the plan to get E.L.'s passport and fly to the United States, and instead made the decision to travel by bus with E.L. through Mexico.  Five days later, when Respondent and E.L. arrived in the United States, Respondent advised Petitioner for the first time, via text message, that E.L. was with him and that the baby was fine.

The same night that Respondent took E.L., a taxi driver sent by Respondent delivered the Florida court documents to Petitioner at her parents' home.   Included within was a document that would allow consent to the relief sought by Respondent in the Broward County proceedings, and would waive Petitioner's rights of notice and appearance at the final hearing.  That was first time that Petitioner became aware of the Broward County proceedings. Respondent told her by text message that if she wanted to resolve the matter, she needed to sign the document. Petitioner did not sign it, and instead filed an application under the Convention with the Guatemalan Central Authority on September 8, 2016. E.L. has been in Florida with Respondent since Respondent took him.

II.     **ANALYSIS**

1. **The Hague Convention and ICARA**

The Hague Convention was adopted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt

return to the State of their habitual residence, as well as to secure protection for rights of access." Convention Preamble.  The primary objectives of the Convention are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State and to ensure that rights of custody and access under the law of one Contracting State are effectively respected in the other Contracting States."  *Id*., Article 1.  Therefore, the underlying premise of the Convention is that custody determinations are best made by the courts of the country in which a child is habitually resident, and to prevent international forum-shopping in child custody cases. *See Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 376 (8th Cir. 1995) (stating that the purpose of the Convention is "to restore the status quo and deter parents from crossing international borders in search of a more sympathetic court.").

> Article 3 specifies that a removal is wrongful if,
>
>     a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
>     b) at the time of removal or retention, those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

For purposes of the Convention, rights of custody "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, Article 5(a).

> ICARA is the Convention's implementing legislation in the United States.  In order to establish a prima facie case of wrongful removal under the Convention and ICARA, a petitioner

must demonstrate by a preponderance of the evidence that "(1) the habitual residence of the child immediately before the date of the alleged wrongful removal was in the foreign country; (2) the removal breached the petitioner's custody rights under the foreign country's law; and (3) the petitioner was exercising custody rights at the time of the removal." *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1340 (S.D. Fla. 2002); *see also* 26 U.S.C. § 9003(e)(1).

The respondent who opposes return has the burden of establishing "that one of the exceptions set forth in article 13b or 20 of the Convention applies" by clear and convincing evidence, or "that any other exception set forth in article 12 or 13 of the Convention applies, by a preponderance of the evidence. 26 U.S.C. § 9003(e)(2). Those exceptions include: (1) where the child is now settled in the new environment; (2) where the person in the care of the child was not actually exercising custody rights at the time of removal, or subsequently consented to or acquiesced in the removal; (3) where there is a grave risk that return would expose the child to physical or psychological harm or otherwise intolerable situation, or (4) the return of the child would not be permitted under the fundamental principles of the requested state relating to the protection of human rights and fundamental freedoms. *Furnes v. Reeves,* 362 F. 3d 702, 712 (11th Cir. 2004)(citing 26 U.S.C. §9003 (e)(2) These "defenses" are narrowly construed, and even if one applies, the court may nevertheless return the child. *Karkkainen v. Kovalchuk*, 445 F.3d 280, 288 (3d Cir. 2006) (citing *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995)). In deciding a petition for return, the court is not deciding the underlying custody case, rather the court decides the merits of the removal claim. *See Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998). Through this lens, the Court analyzes Mother's Petition.

### A.  Habitual Residence

At the evidentiary hearing, the parties agreed that the determinative issue in this case is E.L.'s habitual residence. Moreover, the Respondent does not claim that any of the statutory exceptions apply to this case. The Court agrees.  Unfortunately, habitual residence is not a defined term under the Convention, and the determination of a child's habitual residence is "an assessment of the observable facts on the ground, not an inquiry into the child's or parents' legal status in a particular place." *Redmond v. Redmond*, 724 F.3d 729, 743 (7th Cir. 2013).  This case is further complicated by the fact that the child involved is an infant.  As a result, the customary considerations in analyzing habitual residence from the point of view of the child are not easily applicable.  *Cf. Friedrich v. Friedrich*, 983 F.3d 1396, 1401 (6th Cir. 1993) ("To determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions.").  In the case of an infant, the Court looks instead at "the parents' shared intent or settled purpose regarding their child's residence."  *Nicolson v. Pappalardo*, 605 F.3d 100, 104 (1st Cir. 2010).  "Where a matrimonial home exists, i.e., where both parents share a settled intent to reside, determining the habitual residence of an infant presents no particular problem."  *Delvoye v. Lee*, 329 F.3d 330, 333 (3d Cir. 2003).  However, where there is no marital home and an unsettled relationship between the parents, as in this case, the determination of a settled intent becomes more problematic.  Furthermore, "where the conflict is contemporaneous with the birth of the child, no habitual residence may ever come into existence." *Id.*

Petitioner contends that E.L.'s habitual residence was Guatemala, while Respondent argues that E.L. had established habitual residence in Florida prior to their trip to Guatemala in February, 2016, when Petitioner decided to keep E.L. in Guatemala with her.  Here, as in

*Delvoye*, the Court is presented with the question of whether and when a baby acquires habitual residence.  *Id.*

In *Delvoye*, the mother traveled temporarily to Belgium, where the father lived, to give birth because he refused to pay for the costs associated with delivery, and the delivery in Belgium would be free.  *Id.* at 332.  By the time the child was born, the relationship between the parents had deteriorated, and the mother returned to the United States with the baby when the child was two months old.  *Id.*  After a couple of months of attempting to reconcile, the father filed a petition under the Convention, claiming that the mother had wrongfully removed the baby from Belgium.  *Id.*  Based upon the mother's retained ties to the United States, including the fact that she had not taken any non-maternity clothes with her, that she had only a three-month visa, and that she was living out of two suitcases, the court determined that the parties lacked the "requisite degree of common purpose to habitually reside in Belgium."  *Id.* at 334 (internal quotations omitted).

The facts are similar in the case at bar.  Based upon the repeated conflicting testimony regarding the status of the parties' relationship, the Court finds that Petitioner and Respondent never formed a shared intent to reside either in Florida or in Guatemala.  First, while the parties discussed marriage and Respondent proposed to Petitioner at least once, there was never a determined date for the marriage. Petitioner never wore the ring Respondent gave her, and the parties never announced or otherwise celebrated their engagement. Though certainly not dispositive, the Court notes that even if the parties shared an intent to reside in Florida, Petitioner could not legally do so because she had only a tourist visa, which would permit her no more than a six-month stay at a time in the United States.  Furthermore, other than one consultation with an immigration attorney, who advised Respondent not to marry Petitioner right away, neither

Respondent nor Petitioner took any additional steps to effect a change in Petitioner's immigration status. While Respondent obviously desired that Petitioner and E.L. remain with him in Florida, she evidently did not share that desire. Petitioner's testimony was unequivocal that the relationship with Respondent became unsatisfactory after her three-week visit to Florida with Respondent in June of 2016, and that she unabashedly shared that sentiment with Respondent. Her subsequent hopes to establish a relationship so that her son could be raised in a family environment do not equate to a settled intent to reside in Florida, especially when her business and only means of livelihood and all of her possessions remained in Guatemala. No plans were made to sell or close the Petitioner's business or accounts in Guatemala nor a transfer or shipping of her property, her physical belongings or her many pets. By the time E.L. was born, and following Respondent's disagreement with Petitioner's mother about E.L.'s name, Petitioner and Respondent's relationship had significantly deteriorated, and the main reason Petitioner remained in the United States until February was based upon the midwife's advice concerning E.L.'s health, and in order to await the issuance of a passport for E.L. so that he could travel. The record further reflects that there was no shared intent that E.L. habitually reside in Guatemala, since both parties were well aware that Respondent could not conceivably relocate to Guatemala because of his two older children.

Having decided that there was no shared intent to reside in either Florida or Guatemala, the question, therefore, becomes whether E.L. became habitually resident in Guatemala prior to the time of his removal by Respondent to the United States. The Court finds that he did. In so doing, the Court finds *Kijowska v. Haines*, 463 F.3d 583 (7th Cir. 2006) to be instructive.

In *Kijowska*, a Polish mother entered the United States on a student visa, became involved with an American, and gave birth to their daughter, Maya, in the United States. *Id*. at

586.  Shortly thereafter, the mother and father became estranged, and two months after the birth, the mother returned to Poland with the baby.  *Id.*  Even though the father had initially disavowed seeking custody of the child; unbeknownst to the mother shortly after she left, the father obtained an ex parte custody order from an Illinois state court granting him custody of the baby.  *Id.*  Six months later, based upon the mother's perceived prospect of reconciliation, she and the baby traveled to the United States on a tourist visa to meet with the father.  *Id.*  When they arrived, the father told the immigration officer that the mother intended to overstay her visa, and showed the officer his ex parte state court custody order.  *Id.*  The officer permitted the father to take the child, and the mother was forced to return to Poland alone.  *Id.*  In affirming the district court order returning the child to Poland, the Seventh Circuit determined that when the mother took the baby to Poland when she was two months old, she was not a habitual resident of the United States by virtue of her birth in the United States.  *Id.* at 587.  The Seventh Circuit further found it impossible to reconcile the facts of the case with the child having acquired habitual residence in the United States.  *Id.* at 588.  Significantly, the Seventh Circuit noted the following:

> Suppose that Maya's habitual residence when her mother took her to Poland in December 2004 was the United States and that Kijowska's removal of her was wrongful.  [Father's] remedy would have been to file a petition under the Hague Convention and its implementing federal statute.  He did not do that.  He merely sought a custody order from an Illinois state court and then used that order to help obtain the self-help remedy of taking the child from the airport.  To give a legal advantage to an abductor who has a perfectly good legal remedy in lieu of abduction yet failed to pursue it would be contrary to the Hague Convention's goal of discouraging abductions by denying to the abductor any legal advantage from the abduction.  By failing to pursue his legal remedy, [Father] enabled Maya to obtain a habitual residence in the country to which her mother took her, even if the initial taking was wrongful.

*Id.* at 588-89.

The case at bar is similar.  First and foremost, upon Petitioner's informing Respondent that she and E.L. would remain in Guatemala, Respondent voluntarily returned to the United States on his planned departure date.  Even though Respondent immediately filed a custody proceeding upon his return to the United States, the Court, like the Seventh Circuit in *Kijowska*, finds his efforts are of little relevance in this proceeding and contrary to the purpose of the Convention.  If Respondent believed that Petitioner's decision to keep E.L. in Guatemala was wrongful, the proper legal remedy was to file his own petition under the Convention, which he did not do.  Instead, he returned to the United States and engaged in exactly the type of behavior the Convention is designed to prevent, by filing a custody proceeding in a jurisdiction where he admittedly knew the law would be more favorable to him.  The failure to file a Convention petition in and of itself may have been sufficient to have enabled E.L. to establish habitual residence in Guatemala.

Nevertheless, further factors weigh in favor of the Court's determination in this case. Petitioner and Respondent continued to communicate between March and July of 2016, and upon Petitioner's request, Respondent continued to send money to Guatemala for the baby multiple times.   During these communications, Respondent expressed that he missed his son and Petitioner, how much he loved them both and his belief that their relationship could work, and entreated her to return; at the same time that Petitioner made it clear that she did not share the same feelings.  Even so, Respondent returned to Guatemala three times between March and July, visiting with E.L. and Petitioner each time. At no time, during any of these visits did Respondent inform Petitioner that he had sought relief from the Florida court regarding custody or that he was attempting to enforce any rights Respondent believed he had been granted by a Florida court. During this period, Respondent was aware that E.L. was living in the same house with

Petitioner, his grandparents and uncle, with whom he was bonding. Petitioner was still breastfeeding the child, the child was regularly seen by a pediatrician and attended church with Petitioner and her family. Respondent also did not resist or oppose Petitioner's plans to baptize E.L. in Guatemala.  By the time Respondent abducted E.L. in July, the baby had been living for four months in Guatemala with Petitioner and her family.

Because the Court finds that E.L. did not have a habitual residence until one was established with Petitioner in Guatemala, Respondent's argument that E.L. was habitually resident in Florida before they traveled to Guatemala, and that Petitioner therefore unlawfully abducted E.L. from Florida is unavailing.  The Court therefore need not engage in an analysis of whether, for purposes of the Convention, Petitioner has sufficiently established that E.L.'s habitual residence changed from Florida to Guatemala.

### B.  Custody Rights Under Guatemalan Law

Having determined that E.L.'s habitual residence immediately prior to Respondent's removal of him in July, 2016 was Guatemala, the Court now determines whether the removal was in breach of Petitioner's custody rights under Guatemalan law.

Under the Convention, custody rights do not refer necessarily to custody determined by a court, as they can arise "by operation of law," in the absence of a court order.  *See* Convention, Art. 3.  Article 5(a) is explicit that for purposes of the Convention, custody rights include rights relating to the care of the child and, "in particular, the right to determine the child's place of residence."  Petitioner is a Guatemalan citizen and resident. Therefore, any rights Petitioner may have over E.L. would derive from Guatemalan law.  Article 252 of the Civil Law Code of Guatemala provides that *patria potestas* is exercised over minor children jointly by a married

mother and father, and in any other case, by the parent in whose power the child is.[3]  *Patria potestas* is a civil law concept that has evolved from the original Roman paternalistic authority of a male head of the family over his children into a more general concept including parental duties of affection and support.  *See Lalo v. Malca*, 318 F. Supp. 2d 1152, 1154-55 (S.D. Fla. 2004) (providing historical evolution of the concept of *patria potestas*).  Petitioner and Respondent were not married, so under Guatemalan law, Petitioner held the rights and duties of *patria potestas* at the time Respondent removed E.L. in July because E.L. was with her.  Civil Law Code, Article 261 further provides that children shall be in the power of the mother in the case of an unmarried mother.[4]  Petitioner, therefore, had the absolute right under Guatemalan law to determine E.L.'s place of residence, a right of which Respondent was admittedly aware.

Petitioner's custody rights for purposes of the Convention arose under Guatemalan law independently from any potential *ne exeat* right she may have been attempting to establish through the Security Measures, which sought to prevent Respondent from removing E.L. from Guatemala.  *See Furnes v. Reeves*, 362 F.3d 702, 714 (11th Cir. 2004), *abrogated on other grounds by Lozano v. Montoya Alvarez*, 134 S.Ct. 1224, 1231 (2014) (concluding that a *ne exeat* right is a right of custody under the Convention); *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (same).  The Court is mindful that Petitioner was untruthful in her statements regarding abuse in applying for the Security Measures. Both parties attempted to manipulate the justice system in an attempt to obtain a tactical advantage regarding the physical custody of E.L. This the Court does not

---

[3] **Artículo 252.- En el matrimonio y fuera de él.**  La patria potestad se ejerce sobre los hijos menores, conjuntamente por el padre y la madre en el matrimonio y en la unión de hecho; y por el padre o la madre, en cuyo poder esté el hijo, en cualquier otro caso.

[4] **Artículo 261.- Madre soltera o separada.**  Cuando el padre y la madre no sean casados ni estén unidos de hecho, los hijos estarán en poder de la madre, salvo que ésta convenga en que pasen a poder del padre, o que sean internados en un establecimiento de educación.

condone nor does it factor into the Court's analysis as giving any exclusive right or advantage over the other parent. Yet, here, Petitioner's rights as an unmarried mother are valid and sufficient, regardless of the truth of her statements. It is not the role of this Court to determine the propriety and actual effect of the Security Measures and they are, therefore, irrelevant to the determination of Petitioner's custody rights under the Convention.

### C. Exercise of Custody Rights at the Time of Removal

Under the facts of this case, Petitioner was indisputably exercising her custody rights under Guatemalan law and pursuant to the Convention when Respondent took E.L. back to the United States. As a single mother, she alone had the right to care for E.L. and determine where he would reside. She decided to remain in Guatemala with her son, which Respondent permitted, and had begun in earnest to induct him into their family and culture there. There is no legitimate basis to conclude that Petitioner consented to or acquiesced in Respondent's removal of E.L. in July, 2016. The facts compel the exact opposite: after realizing that her child was gone, Petitioner went immediately to a police station and began filing reports, requesting AMBER alerts, involving Interpol, and duly filing her Petition under the Convention.

### III.   CONCLUSION

Because E.L. was wrongfully removed by Respondent from Guatemala, his habitual place of residence, and none of the exceptions to the Convention have been proven, E.L. should be immediately returned to Guatemala in the care of his mother, Ms. Reyes Ovalle.

This order determines that Ms. Reyes Ovalle has the exclusive right to legal and physical custody of E.L. until his return to Guatemala. At that time, the parties will be able to pursue legal custody proceedings in accordance with the laws of Guatemala.

Case No. 16-cv-62134-BLOOM

Accordingly, for the reasons set forth above, it is **ORDERED AND ADJUDGED** as follows:

1.   The Petition, **ECF No. [1]**, is **GRANTED**.

2.   The parties are directed to appear before the Court on **Wednesday, October 19, 2016 at 10:00 a.m.** to retrieve their passports.[5]  Respondent, Noe M. Perez, shall bring E.L. and any items necessary for his care and immediate travel back to Guatemala.

3.   The United States Marshals Service is **DIRECTED** to ensure that Ms. Reyes Ovalle is able to comply with this order, and shall accompany her, if necessary, to the airport.  All other federal, state, and local law enforcement agencies and officers are notified that Ms. Reyes Ovalle possesses the authority to remove E.L. from the United States and return with him to Guatemala.

4.   Pursuant to 22 U.S.C. § 9007, Petitioner is entitled to reimbursement by Respondent of the necessary expenses incurred during the course of proceedings in this action. Petitioner shall file an affidavit setting forth the allowable costs and fees she seeks to recover **no later than November 10, 2016**.

**DONE AND ORDERED** in Miami, Florida, this 17th day of October, 2016.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

---

[5] The Court notes that there are two passports for the child, the later one obtained by the Respondent as replacement for a "lost passport" after the wrongful removal.